## Case No. 15,141.

### UNITED STATES v. FOSTER.

[2 Biss. 377;[1] 3 Chi. Leg. News, 113.]

Circuit Court, E. D. Wisconsin. Oct. Term, 1870.

INDIANS—OWNERSHIP OF LANDS—TIMBER.

1. The Indians on the Oneida reservation have the right to cut and use the timber there-

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

on, and to sell sufficient to support themselves and families.

2. They must be treated as owners of the land, their ownership however being subject to the rights of sovereignty of the United States.

3. The power of the United States to sell this reservation commented upon.

Replevin brought by the United States against the defendant for a quantity of logs which, it is alleged, were cut on the Oneida reservation, near Green Bay, in the state of Wisconsin.

Levi Hubbell, U. S. Dist. Atty.

Smith & Stark, for defendant.

DRUMMOND, Circuit Judge. The facts of the case seem to be substantially as follows: On the 8th day of February, 1831, the Menomonee Tribe of Indians, by articles of agreement made with the United States, which were afterwards ratified by the senate with a proviso not affecting the question in this case, which thereby became a treaty between that tribe and the United States, ceded a certain tract of land to the United States for the benefit of the New York Indians. That tract included what is now known as the Oneida reservation. It would seem that at that time, the Oneida Indians were in possession of the Oneida reservation, and have continued in possession ever since. On the 4th day of January, 1836, the Oneida Nation made a contract of lease to Daniel Bread, one of their tribe, authorizing him to construct a dam and saw-mill on Duck creek, within the reservation, and to cut all the timber thereon necessary to build the dam and mill, as well as do lumbering thereat. Any one of the nation had a right to cut and draw logs to the mill, and one-half of the boards were to go to the mill, and the other half to him who cut and drew the logs. This condition as to the division of the property was to continue four years, and after that those who drew the logs were to be entitled to two-thirds of the boards. The lease concludes with this stipulation: "And the said Bread and his heirs and assigns shall have privilege to cut all logs necessary to keep the mill constantly running." By the terms of this lease this arrangement was to be perpetual. It appears the dam and mill were constructed by Bread, and that lumber has been manufactured there from that time up to the present, and that the defendant claims under this lease and is now and has been for some time in possession of the mill. On the 3d day of February, 1838 [7 Stat. 566], a treaty was made between the first Christian and Orchard parties of Indians, by which they agreed to cede to the United States all their title and interest in the lands set apart for them in the first article of the treaty with the Menomonees, already referred to; but by a second article of the treaty of February 3, 1838, there was reserved to the Indians from the foregoing cession, and to be held as other Indian lands, a tract of land containing one hundred acres for each individual, and it is

this that is now called the Oneida reservation; and the Oneidas were a party to this treaty of 1838, by the name of the first Christian party of Indians. It will be seen, therefore, that by the terms of this treaty of 1838 the United States contracted with the Oneidas for the purchase of the land which had been ceded to them by the Menomonees in 1831, and that they reserved by express terms to the Oneida Indians what is now known as the reservation. There seems to be no controversy about these facts, and the Indians have been treated from that time as the owners and possessors of the land. Since the lease was made in 1836 it appears that the Indians have resided upon the land, and have cultivated it to a greater or less extent, and have been in the habit of cutting and hauling logs to the mill constructed under the lease. It is to be observed that this lease was made under the direct sanction of Mr. Boyd, the Indian agent of the United States at that time, as is manifest from his signature to a memorandum stating that fact, attached to the lease. The lumber has been cut and used in the manner already described, it would seem, with the acquiescence of the federal authorities.

Recently stringent instructions have been given to the superintendent of Indian affairs that no timber shall be cut upon the reservation, except what may be necessary for the personal use of the Indians. It appears by the evidence that about one hundred thousand feet of the lumber in controversy in this case was cut on the reservation by some of the Indians, and sold to the defendant.

[There is a statement made by the agent of the government that the defendant admitted to him that there was as much lumber at the mill as was replevied in this case which came from the reservation, but it does not distinctly appear who cut or sold the remainder of the lumber in controversy, exceeding the one hundred thousand feet already referred to.] [2]

But it does not distinctly appear who cut or sold the remainder. One of the questions that arise in the case is, whether for the lumber that was cut and sold to the defendant by the Indians themselves, the action of replevin can be maintained by the United States. And I am of the opinion that if it was cut and sold for the purpose of supporting the Indians or their families, the action of replevin cannot be maintained. The Indians were in possession and were the owners of the land, so acknowledged to be by the government of the United States. It is true they were in possession as other Indians, according to the language of the treaty of 1838; but the understanding

seems to be that while the ownership of the Indians could not interfere with the rights of sovereignty on the part of the United States, as a nation, and that the Indians might be compelled to sell the lands to the United States, that for all purposes the Indians must be treated as owners of the land, with the right to use it for all the purposes of tillage; to take fuel, wood for building and fences, and for their ordinary support. If this is so, while, perhaps, there may be some question whether the Indians would have the right to commit waste, properly so called, upon the land, or to use the timber for the purpose of speculation, still there can be no doubt they would have the right to clear the land for cultivation; and, if so, it would seem, to sell the wood thus obtained from the land; and to say that they could have the right to cut and use the wood and timber for these purposes, and that they could not sell it to enable them to obtain necessary articles, such as nails and other materials for the construction of their buildings and fences, would seem to be making a very refined distinction and one not warranted under the circumstances of the case.

This land is the only means of support which these poor people have. At the time of the treaty of 1831 [7 Stat. 342], the tribe consisted of less than six hundred persons. There are now about twelve hundred. The contributions of the government to these people are comparatively insignificant, furnishing them really no sufficient means of support, and, therefore, they must rely upon the land itself, and what comes from the land; and to insist that in the case of failure of crops, even if it be contended that it is their duty to cultivate the land, they could not take the wood necessary for their support, would be something not warranted by the principles of equity, and certainly ought not to be sanctioned by a court of justice.

I am therefore of the opinion that these Indians had the right to cut this timber on their own land for the purpose of contributing to the support of themselves and families. It is proved that this right has been exercised for many years with the sanction of the government and with the express consent of the tribe itself in council.

It may be doubted whether this reservation can be sold by the United States in the present condition of the title, even by act of congress, without the consent of the Indians themselves, but it is certain that it cannot be without an express law; and if the precedents which have always existed in such cases should be followed, it cannot, and ought not to be sold by the government, until the rights of the Indians are purchased, and with their free consent.

---

[2] [From 3 Chi. Leg. News, 113.]