Davis, Judge,
delivered the opinion of the court:
In the first years of the 1830’s, a large number of Oneida Indians, encouraged by the Federal Government, moved from upstate New York to live on lands in Wisconsin acquired for them from the Menominees. By the Treaty of February 3, 1838, 7 Stat. 566, these groups (known as the First Christian and Orchard parties of the Oneidas) ceded to the United States all these lands, except for a reservation (of about 65,000 acres) “in the vicinity of Green Bay” “to be 'held as other Indian lands are held.” This reservation (Boyce designates it as Area 158) became tribal property and remained so until the lands were allotted to the individual members of the Tribe shortly after the passage of the General Allotment Act of February 8, 1887, 24 Stat. 388. In 1838 this area was covered by a dense growth of pine and hardwood timber. Portions of the spread were cut down to clear farms for many of the Oneidas, but large tracts within the reserved land remained virgin forest.
From the establishment of the reservation in 1838, continuing -until the allotments in 1889, there was misuse by certain Oneidas of these forested areas. Timber was cut, not only to create farms, but chiefly to sell, and the logs were then sold to mills and settlers on the adjoining non-reservation lands. This continuing cutting-and-selling by individual members of the Tribe gravely depleted the timber resources of the reservation. The Tribe as a whole suffered *490 substantial losses, though, the depredators gained whiskey or money for themselves.
Appellant made claim, under Section 2 of the Indian Claims Commission Act, 25 U.S.C. § 70a, for the value of this timber and the amount of the loss. Docket No. 159 of the Indian Claims Commission. The petition made demands under subsections (1), (2), and (5) of Section 2.[1] The gist of the claims was that the United States, although obligated to protect the Tribe’s timber resources, did not take adequate steps to end the lawless timber-cutting. After a hearing at which both sides introduced only documentary evidence, the Commission determined that the Tribe was not entitled to recover and denied it any relief. 12 Ind. Cl. Comm. 1 (Dec. 6, 1962). The Commission held that the timber was tribal property and that the Tribe had suffered a loss, but that in the circumstances the United States was not liable for the loss. On this appeal the appellant attacks the holding against liability, while the appellee reasserts its special defense (rejected below) that the Tribe had no rights in the cut timber and therefore could suffer no tribal loss.
I
We agree with the Commission that the Oneida Tribe had a sufficient interest in the timber on which to base a claim under the Indian Claims Commission Act. The normal rule is that stands of wood on a tribal reservation belong to the tribe. United States v. Shoshone Tribe, 304 U.S. 111, 116, 117, 118 (1938); United States v. Klamath & Moadoc Tribes, 304 U.S. 119, 122-23 (1938); Federal Indian Law (1958), p. 657. The Government sees a difference in this case because the 1838' Treaty provided that the reservation land was “to be held as other Indian lands are held.” 7 Stat. 566. This is said to mean that the Indians had aboriginal title, not recognized title; and aboriginal title, it *491 is then, argued, supports no claim whatever, in law or equity, against the United States (see Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 277-79, 281 (1955)). But in applying the comparable provision of the Menominee Treaty of 1854, 10 Stat. 1064, 1065 — “to be held as Indian lands are held” — this court considered that the treaty gave the tribe a sufficient interest in the reservation’s timber to bring suit for a loss through the Government’s negligence. Menominee Tribe v. United States, 101 Ct. Cl. 22, 24, 38 (1944). The treaty in Klamath c& Moadoo Tribes, supra, set aside an area for the Indians’ residence to be “held and regarded as an Indian reservation.” 10 Stat. 707, 708 (1864). We think that the Oneidas’ 1838 Treaty, like the Menominee’s 1854 Treaty, meant no less than the Klamath treaty — i.e., “held and regarded as an Indian reservation” — in referring to the way “Indian lands are held.” This phrase should be read, not as pointing to aboriginal title simpliciter, but as equating the Oneidas’ tract with that of other Indian reservations. In that way Congress recognized the Oneidas’ title to the reservation and its resources.[2] The Tribe’s petition, therefore, properly states a cause of action under Section 2 (1) and (2) of the Indian Claims Commission Act.
This conclusion does not contradict the holding in United States v. Go oh, 19 Wall. 591 (1874), in which the Supreme Court decided that the United States could’ bring replevin against a purchaser of logs cut from the Oneida Reservation. In answering the contention that the Indians had full authority to cut and sell the timber, the Supreme Court used somewhat broad language contrasting the Government’s fee title with the Tribe’s mere “right of occupancy.” But all that the case held was that the Indians could not sell the timber without governmental authority and that the United States had a sufficient interest to bring a replevin action. The same relatively narrow foundation lies at the bottom of Wooden-Ware Co. v. United States, 106 U.S. 432 (1882) (another case involving logs unlawfully cut from the Oneida Reservation). The Supreme Court has explained *492 Ooolc in this fashion. In United States v. Shoshone Tribe, supra, 304 U.S. at 118, the Court said:
United States v. Cook, supra, gives no support to the contention that in ascertaining just compensation for the Indian right taken, the value of mineral and timber resources in the reservation should be excluded. That case did not involve adjudication of the scope of Indian title to land, minerals or standing timber, but only the right of the United States to replevin logs cut and sold by a few. unauthorized members of the tribe. We held that, as against the purchaser from the wrongdoers, the United States was entitled to possession. It was not there decided that the tribe’s right of occupancy in perpetuity did not include ownership of the land or mineral deposits or standing timber upon the reservation, or that the tribe’s right was the mere equivalent of, or like, the title of a life tenant.[3]
Were one, nevertheless, to accept at face value appellee’s assumption that the Oneidas held no more than aboriginal Indian title, we still could not find their claims beyond the scope of the Indian Claims Commission Act. Without that legislation, a justiciable claim might not be stated. See Tee-Hit-Ton Indians v. United States, supra. But the Act has authorized recoveries on the basis of original Indian title (Otoe & Missouria Tribe v. United States, 131 Ct. Cl. 593, 131 F. Supp. 265, cert. denied, 350 U.S. 848 (1955)), and there is no reason why a claim of the sort presented here could not come under the “fair and honorable dealings” provision (section 2(5))- — at the minimum. If the Federal Government failed to treat fairly and honorably, in the circumstances, with the reservation timber, the defendant would be liable under the Act even though no conventional claim in law or equity was presented.
II
The more difficult problem is whether the Tribe has made out a case under its petition. The defendant urges that the 1838 Treaty did not create any guardian-ward or fiduciary-beneficiary relationship between the Federal Government and the Oneidas, and therefore that the Government had no *493 responsibility to prevent wastage of the timber. We do not discuss the question of whether, and to what extent, the United States has had, in general, the technical status of guardian or fiduciary toward its Indian dependents. Cf. Gila River Pima-Maricopa Indian Community v. United States, 135 Ct. Cl. 180, 181-89, 140 F. Supp. 776, 779-81 (1956); Sioux Tribe v. United States, 146 F. Supp. 229, 237-38 (Ct. Cl. 1956).[4] In the Oneidas’ case, we are satisfied that — at least for the purposes of the Indian Claims Commission Act — the United States could not stand on the other side of the road and avert its face from the continuing loss of the timber. The Tribe was a dependent group which had been encouraged by federal officials to leave its home in New York and migrate to Wisconsin. Land was procured for it from the Menominees (7 Stat. 343,7 Stat. 407), and in 1838 it ceded that area to the Government, exempting the reservation. The Government retained the fee to the reservation and the Indians had the beneficial interest. The Commissioner of Indian Affairs maintained supervision over the tract and the Indian Agent at Green Bay was entrusted with that duty. There was a continued concern, on the part of the Indian Office, with the life and livelihood of the Tribe. In similar circumstances, when a special jurisdictional act allowing the Menominees to sue for lost timber provided that this court should consider the United States a fiduciary, the court said that the statute added little to the settled doctrine that the Federal Government, as regards its dealings with the property of the Indians, is a trustee. Menominee Tribe v. United States, 101 Ct. Cl. 10, 19; Menominee Tribe v. United States, 101 Ct. Cl. 22, 40 (1944). We think, similarly, that in this suit under the Indian Claims Commission Act we must hold that the United States had an obligation to the Oneidas greater than that of a non-participating bystander, or of a sovereign toward its ordinary citizens, or of a landowner toward his tenant. The relationship was special and from it there stemmed a special responsibility.
*494 It is unimportant, in this case, to characterize that obligation precisely. Whether the responsibility be termed that of a guardian, a fiduciary, a trustee, a protector, or of a superior sovereign to a dependent people, the duty of care imposed upon the defendant would foe the same. It would not reach the insurer’s level nor fall to that of an outsider. The measure of accountability depends, whatever the label, upon the whole complex of factors and elements which should be taken into consideration. The real question is: Did the Federal Government do whatever it was required to do, in the circumstances, to save the timber?[5] That is the standard.
Ill
In appraising the defendant’s responsibility, we have the advantage of substantial agreement upon the basic facts. The record is entirely documentary and there are no issues of testimonial credibility. The Commission’s findings are very general, and except for certain conclusory .sentences both parties are prepared to accept them in the main. The differences argued to us are primarily differences in judgment, not in historical fact.
From the findings as supplemented by the contemporaneous papers, we gather that timber-cutting took a large role in the Oneidas’ life even before the reservation was formally created. In 1836, some of the chiefs of the First Christian Party signed an agreement with another chief, Daniel Bread, leasing him land on which to construct a dam and sawmill. Any Oneida had a right to cut logs and draw them to this mill; payment for the milling was to foe in kind (a portion of the boards fabricated by the mill). Presumably the mill was to be used only for timber properly cut to clear .lands- for farms, and for conservatory or agricultural purposes, but it seems probable that it was also utilized, as time went on, by Indians cutting logs purely for purposes of *495 sale.[6] At any rate, such improper cutting-and-selling by individual members of the Tribe began early and continued for many years. The Commission found that it ended about 1870 — after the United States had successfully sued merchants who bought such lumber from the Indians — but the documentary record proves that serious complaints about illegal timber-cutting continued until about the time (approximately 1889) the reservation lands were allotted in severalty to the individual tribal members under the General Allotment Act of 1887, 24 Stat. 388.[7] Various members of the Tribe seemed to feel that it was easier to obtain a livelihood by chopping and selling the trees on the parts of the reservation not used for farming than by cultivating the soil. Generally, the payment received from outsiders was less than the true value of the timber, and the purchase price was often drained off into whiskey. Nevertheless, the cutting went on and resulted in loss of a major part of the wooded resources of the reservation.
This depredation by members of the Tribe was known to the successive Indian Agents who reported the facts to the various Commissioners of Indian Affairs over the years.[8] So far as the records show, these reports by Agents appear to have been begun in 1854 and continued through the 1880’s. The reports show that there was a continuous serious conflict within the Tribe over the timber-cutting. Probably a. majority of the chiefs and the members were opposed to this activity, but a significant number of chiefs and a large portion of the Tribe encouraged, approved, or condoned the practice. Those who were opposed to the waste desired that some action be taken to put an end to it, while the cutting party resisted all such efforts, particularly the suggestions *496 which would have been, effective. It is clear that this internal dissention lasted for most of the period, and that those who favored the spoliation were strong and persistent. In the report of the Supreme Court case of United States v. Cook, supra, 19 Wall. 591, 592 (1874), involving cutting on the Oneida lands, it is said that “evidence was offered tending to prove that timber on the reservation had been cut and sold by the Indians of the tribe continually since .1838, with the tacit consent of the officers of the tribe.” (Emphasis added.) From the present record it appears that this consent was not given by all or a majority of the chiefs, but it is also plain that several of the significant tribal officers did encourage and support the cutting.
Several proposals were put forth, through the decades from the late 1850’s to the 1880’s, to cure the deteriorating situation. One was for the resident agents to discourage and prohibit the improvident cutting. This was done repeatedly. The Indian Office issued such instructions again, and again; the agents expostulated and remonstrated. The results were poor — the cutting continued. Another theoretical possibility was the exertion of tribal authority and the imposition of tribal sanctions. In fact, this approach could not be utilized because of the conflicting positions of the chiefs and the erosion of the tribal system of punishment and sanctions; tribal criminal justice seems to have fallen into almost complete disuse and the moral influence of those chief s who wished to stop the cutting was slight.
Still another suggestion was that the criminal law of Wisconsin be extended to the Eeservation, or that the Federal Government pass legislation making it an offense to chop the timber or to receive it from the Indians. Both of these solutions required Congressional action, and both were tied to the larger and much mooted problem of the extent to which the Federal Government should create or sanction a non-Indian criminal code for Indian reservations.' It was not until 1888 that Congress made it a federal criminal offense to cut timber on Indian lands. Act of June 4, 1888, 25 Stat. 166.
The most important proposal was that the. land of the reservation be allotted to the individual members who could *497 then fence and look after their own tracts. But this suggestion, too, required a federal statute, and was likewise connected with the general problem of allotments of Indian land throughout the country. For the Oneidas there was an added difficulty. The cutting party forcefully opposed the allotment of the reservation. There are documents in the record showing that on this subject the chiefs of the Tribe were very closely divided, and that the adverse group threatened or intimated violence if the proposal were carried through against its wishes. The same contentiousness, with threats of violence, surrounded the alternate proposal that all or part of the forested areas be sold to the Federal Government or to another tribe.[9]
Lastly, there was the possibility of suits against the settlers and merchants who bought timber from the Indians. It was unclear for many years whether such an action could be brought by the United States. In some quarters it was believed the timber belonged to the Indians and the United States had no interest. This was the ruling of the circuit judge when the Federal Government, about 1868, sued Foster who had acquired and enlarged Daniel Bread’s mill (see *498 footnote 6, supra). The Government lost the case. United States v. Foster, 25 Fed. Cas. 1171, Case No. 15,141 (C.C.E.D. Wis. 1870). In 1874, the Supreme Court held the opposite in United States v. OooTe, supra. Several other cases of this type were brought and won by the United States. Even these decisions, however, did not end the depredations. As we have already indicated, the illegal cutting-and-selling continued well into the 1880’s, until individual allotments were made.
This is the history which must be assessed. The Indian Claims Commission seems to have thought that the United States was duly diligent, but we camiot accord the Commission’s view of the facts the usual weight because that portion of its opinion is both too summary and too closely entwined with its apparent position that the United States did not have any special responsibility toward preservation of the tribal forest (see footnote 5, supra). We agree, however, on our own appraisal of the history, that the defendant did the minimum (at the least) it was called upon to do, in the circumstances, to save the timber.[10]
For the Federal Government the most difficult aspect of the problem was that the depredators were members of the Tribe. This, in itself, would not excuse the United States from shouldering all responsibility. But the sharp division within the Tribe did make a difference in the action the defendant could be expected to take. If the cutters were few or weak or opposed by the united strength of the group, the defendant might well be held to greater efforts. As we have pointed out, that was not the situation on the Oneida Reservation. The unlawful cutting 'had its seed in the Bread mill sanctioned by the Tribe itself — a project which, though it may have been started with the best of intentions, easily lent itself to misuse. Throughout the period, the party upholding the cutting had the support of a substantial *499 segment of the Tribe and of the chiefs. That party was strong and persistent; at times it may even have been close to a majority; it muttered about the violence which would occur if its activities were stopped; and the possibility of open internal conflict was far from slight. Tribal authority proved ineffective to control the dissidents. The Indian Agents unsuccessfully tried persuasion, expostulation, and prohibition. There were no operative federal criminal sanctions.
All that remained for the Executive Branch to do, within the powers then vested in it, was to use the military or to institute suits against the purchasers of the logs. We certainly cannot say that the Federal Government breached its duty by failing to call out the troops. The close division in the Tribe, and the strong feeling of the adverse group, would counsel against that drastic remedy. There were, besides, other calls upon federal soldiers during the 1860’s and the first half of the 1870’s — the period of the Civil War and Reconstruction. The need for surveillance on the reservation would be constant and, undoubtedly, adequate troops could not be spared. As for court actions against the purchasers, they might perhaps have been brought some years earlier, but three factors lead us to find no breach of duty in the delay. First was the ever-present contention among the Oneidas, which would prompt caution.[11] Second was the uncertainty (to which we have referred earlier) as to the right of the Federal Government to file such suits. Third, and perhaps most significant, is the fact that the cutting was not stopped by the successful suits which were ultimately brought; this type of litigation did not prove in actuality to be an effective remedy.
The remaining weapons of the Federal Government were all legislative. Congress might have earlier provided criminal sanctions against the cutting or it might earlier have authorized the allotment of the reservation. This need for Congressional legislation is a prime element in weighing the defendant’s duty. Where the obligation of the United States is akin to that of a fiduciary, we would normally be *500 slow to charge the defendant with a breach if the failure were a failure by Congress to enact new substantive legislation. The legislative process is a function of so many varying components and interests — general and particular — that it cannot ordinarily be appraised by the measure of the fiduciary standard. Just as the United States as contractor is not responsible for the acts of the United States as sovereign (Horowitz v. United States, 267 U.S. 458 (1925)), so the United States as guardian, fiduciary, custodian, or protector is not easily to be held for the refusal or failure of Congress to pass new statutes. The concerns of Congress are too many-sided to permit its being bound, at peril of the defendant’s liability, to reach out and deal with particular problems. To these general considerations the present case adds its own special support. The issue of a criminal code for Indian reservations was general, not limited to the Oneidas, and it was controversial; the same was true of the allotment of Indian lands. In the nature of legislative deliberation, enactments of this type might well require a long period of gestation, especially in an era when the minds of the country and of Congress were centered on other pressing themes. The question of allotment, in particular, had widespread ramifications far beyond the limited difficulty of the Oneidas with their timber. The wisdom of dividing up the tribal lands is still debated some seventy-five years after the General Allotment Act.
The result is that we cannot say that the defendant did less than it was required to do in the situation facing it on the Oneida Reservation. What the Government did was ineffective,- but in view of all the circumstances it was not compelled to go further. The Tribe permitted, through weakness and division, the wasting by its own members of the tribal assets; intervention by the Indian Agents and litigation against purchasers of the timber failed to end the practice; it could be stopped only by a more forceful or more far-reaching type of intervention which the United States was not obliged to invoke.
The appellant has failed to make its case. The decision of the Indian Claims Commission must stand.

Affirmed.

 “(1) claims in law or equity arising under the Constitution, laws, treaties of the united States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort with respect to which the claimant would have been entitled to sue in a court of the united States if the United States was subject to suit; * * * and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.”

 Tee-Hit-Ton Indians v. United States, supra, did not involve a treaty reservation lifce appellant’s, and the Court held that Congress had never recognized the Indians’ title by legislation or otherwise.

 This court took the same position when the Shoshone case was before it. 85 Ct. Cl. 331, 365 (1937).

 Tie court’s decision of November 7, 1956, in Sioux Tribe was not officially reported. By order of tbe court, dated November 5, 1958, tbe appellant’s motions for a new trial and to vacate the judgment of Nov. 7, 1956, were granted and tbe case was remanded to the Indian Claims Commission for further proceedings.

 The Commission below ruled that the appellant “has not established a guardian-ward or fiduciary relationship.” If the opinion meant by this to hold that the defendant had no special relationship to the Tribe’s property, the Commission erred. The opinion then seems to go on to say that, in any event, there was no default by the Government.

 Some years after he built his sawmill, Daniel Bread assigned his agreement to Foster, a non-Indian. Foster enlarged the mill and dam, and it is clear that- in Foster’s time a large part of the mill’s worh was done on timber illegally cut by Oneida depredators.

 The record contains an Interior Department communication, dated July 26, 1887, referring to the cutting and sale by Oneida Indians of timber on their reservation. A letter of January 10, 1878, refers to “the continuing violation' in the cutting of timber” on Indian reservations, including the Oneidas’.

 There is not the slightest suggestion that the Indian Agents (or other officials of the Federal Government) participated in, or gained from, the cutting-and-selling.

 In 1868, the Indian Agent reported that “upon the subject of the treaty proposed to them [selling land to the United States for other Indians], seven of their .Chiefs , representing, it is believed, a majority of the’ whole Tribe, are in favor of entering into the arrangement, while the remaining six bitterly denounce the proposition and oppose the consummation'. The minority even go.so far as to threaten violence in case the friendly Chiefs make a treaty.” In 1869, the Agent reported “that the party opposed to allotment is composed of a large number of young men of the tribe calling themselves Warriors. That they resist the sale or survey and subdivision of the lands because it would interfere to prevent the wholesale cutting and sale of the pine timber on the Reserve, as each would then be restricted to the particular lot or parcel which would fall to his share in the allotment. * * * They disregard all Instructions and insist on their right to cut indiscriminately on any part of it’-’and remove and dispose of the timber in defiance of all attempts on my part to put an end to their traffic.” (Emphasis in the original.) The same report recites that, after proceedings were brought against Cook (a mill owner Who procured logs from the cutting Indians), “These proceedings interfering, in a measure, with the disposal of their logs, a Council was called (and I am credibly informed) at which it was proposed to depose all the old chiefs who did not coincide with the views of the Warriors and threats were made that they would get rid of them by foul means if necessary to prevent further interference with their lawless proceedings. Against Daniel Bread, Head Chief, particularly they expressed most bitter denunciation and threats of violeriee because he had taken the responsibility without their consent of making the' complaint upon which Cook was arrested.” ,(Emphasis in’the original.) ’ Still other reports reflect threats and potential violence by the cutting party.

 We do not remand to the Commission to make the evaluation under the proper legal standard (cf. Spokane Tribe v. United States, 163 Ct. Cl. 58, because (a) the Commission may already have made that appraisal in summary form, (b) the record is entirely documentary and neither party suggests new evidence, (c) in large part we believe the conclusion we reach to be compelled by the record, and (d) there are no further proceedings before the Commission on any aspect of the case.

 As indicated in footnote 9, supra, tlie suit against Cook brought, in its wake, threats of violence and recrimination against the part of the Tribe supporting the litigation.