NIES, Chief Judge,
concurring.
I agree with much of the scholarly opinion of my colleague. Nevertheless, I feel compelled to write because I believe I have a somewhat different understanding of the remaining issues in this action. The majority remands for a determination of whether the Tribes have a fair and honorable dealings claim without providing in my view, sufficient focus for the remand inquiry. If the majority means to leave open the possibility that the Tribes may, under the fair and honorable clause of the Indian Claims Commission Act of 1946, Pub.L. No. 79-726, § 2, 60 Stat. 1049, formerly codified at 25 U.S.C. § 70a (1976) (ICAA), have a claim for compensation for riverbed lands, the title to which the United States did not actually acquire (i.e., through inverse condemnation) and for water power values associated with Tribal lands that were purchased, I disagree. That possibility is, in my view, foreclosed for the reasons explained herein. Nevertheless, I agree that there should be a remand for consideration of the Tribe’s fair and honorable dealings claim. Before getting to an analysis, I find it necessary to set out in more detail the statutes and facts relating to the issues before us.
By agreement between the United States and the Colville Tribes dated May 9, 1891, ratified by the Act of June 21, 1906, c. 3504, 34 Stat. 325, 377-78, the United States agreed:
that said Indians shall enjoy without let or hindrance the right at all times freely to use all water power and water courses belonging to or connected with the lands to be ... allotted.
By the Act of June 25, 1910, c. 431, §§ 13, 14, 36 Stat. 855, 858-859, the Secretary of the Interior was authorized, for the benefit of Indian tribes, to reserve from “location, entry, sale, allotment, or other appropriation any lands within any Indian reservation, valuable for power or reservoir sites____” At Colville, power sites which had been already allotted were not cancelled, but the Secretary withdrew and reserved for the Tribes numerous power sites including significant portions of the flood areas later taken for the Grand Coulee Dam. From the materials of record, it appears that the actual Grand Coulee Dam site was not a reserved site.
Under Section 10e of the Federal Power Act of 1935, 49 Stat. 842, codified as amended at 16 U.S.C. § 803(e), licensees must pay Indian tribes annual fees based on power production for the use of Indian *1118 power sites. The Tribes’ brief states — and it is not contradicted — :
During the years 1927-1931, at the direction of Congress, the Corps of Engineers investigated the Columbia River and its tributaries. The Corps’ Report listed a number of sites, including Grand Coulee, where power could be produced at low cost, and recommended that the development be performed by local governmental authorities or private utilities under the Federal Power Act (then the Federal Water Power Act). App. pp. 122, 124. Shortly thereafter, the Columbia Basin Commission, an agency of the State of Washington, applied for, and in August 1933 received, a preliminary permit from the Federal Power Commission for the water power development of the Grand Coulee site. App. pp. 126-141. The permit recognized that the dam project “would affect lands within the Colville and Spokane Indian Reservations” (App. p. 137) and specifically made the permit subject to “[s]uch provisions as the Secretary of the Interior and the Bureau of Indian Affairs may commend, and the [Federal Power] Commission may approve, for the protection of the interests of the Indians of the Colville and Spokane Indian Reservations, and any other Indian lands which may be affected; including such payments by the licensee for the use of Indian lands as the Commission may determine to be reasonable; * * *.” App. p. 138.
However, the above identified preliminary permit was cancelled. Instead, the federal government, which is not subject to the Federal Power Act, undertook to build the dam. That action precluded fruition of efforts by the Tribes to commercialize their water power.
The federal government began building the dam in the mid-30’s. The record before us does not disclose from whom the government acquired the lands at the dam site. However, a condemnation case, Continental Land Co. v. United States, 88 F.2d 104 (9th Cir.1937), appears to concern that acquisition from Continental and informs us:
The nearest tribal land of the Colville Indian Reservation is half a mile above the dam. This reservation extends along the side of the river for over 100 miles. It is not possible to construct a dam at that site without flooding both the allotted and the tribal lands of the Colville Indian Reservation. The Spokane Indian Reservation will likewise be flooded by the back waters.
It was not until the dam was almost complete that Congress authorized acquisition of Tribal lands needed for the project. Act of June 29, 1940, c. 460, 58 Stat. 887, codified as amended at 16 U.S.C. § 835d et seq. Pursuant to that authority the Secretary of Interior designated and paid for Tribal lands that would be flooded. Although unclear, it appears that the Tribes assert a right to compensation for the taking of lands in the river to its midpoint on which the dam was actually built, as well as for the entire stretch of the river along the border of the reservation. The government disputes that the Tribes own any riverbed lands and that issue is not here resolved.

Compensation for Lands Taken

The first issue raised, concerns the Tribes’ entitlement to compensation for water power values associated with their lands. The Tribes assert that even though the navigational servitude may be exercised by the United States without liability under the Constitution for water power values of riverbed or riparian lands, Congress is free to provide for compensation and has done so with respect to the power values of Colville lands by entering into the 1891 agreement with the Tribes and by enacting the three statutes discussed above. The Tribes argue that by these acts Congress specifically undertook to protect Indian water power values and effectively waived the sovereign’s right to exercise the power of navigational servitude without compensation.
In United States v. Cherokee Nation of Oklahoma, 480 U.S. 700, 107 S.Ct. 1487, 94 L.Ed.2d 704 (1987), the Supreme Court addressed the question whether compensation for a taking was required for the Chero *1119 kee’s riverbed lands by reason of navigational improvements made on the Arkansas River. The federal project damaged sand and gravel deposits in the .riverbed which was owned by the Tribe. As explained therein:
Though “this Court has never held that the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation,” Kaiser Aetna v. United States, 444 U.S. 164, 172 [100 S.Ct. 383, 389, 62 L.Ed.2d 332] (1979), there can be no doubt that “[t]he Commerce Clause confers a unique position upon the Government in connection with navigable waters.” United States v. Rands, 389 U.S. 121, 122 [88 S.Ct. 265, 266, 19 L.Ed.2d 329] (1967). It gives to the Federal Government “a ‘dominant servitude,’ FPC v. Niagara Mohawk Power Corp., 347 U.S. 239, 249 [74 S.Ct. 487, 493, 98 L.Ed. 666] (1954), which extends to the entire stream and the stream bed below ordinary highwater mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject.” Rands, supra, at 123 [88 S.Ct. at 267]. See also United States v. Kansas City Life Ins. Co., 339 U.S. 799, 808 [70 S.Ct. 885, 890, 94 L.Ed. 1277] (1950); Scranton v. Wheeler, 179 U.S. 141, 163 [21 S.Ct. 48, 57, 45 L.Ed. 126] (1900).
Id., 480 U.S. at 704, 107 S.Ct. at 1489-1490 (footnotes omitted). As further explained, to overcome the servitude imposed on all owners of riverbed rights in navigable waters, there must be a waiver. Moreover, the Court stated:
“[s]uch a waiver of sovereign authority will not be implied, but instead must be ‘surrendered in unmistakable terms.’ ” Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 52 [106 S.Ct. 2390, 2397, 91 L.Ed.2d 35] (1986), quoting Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 [102 S.Ct. 894, 907, 71 L.Ed.2d 21] (1982). Respondent can point to no such terms.
Id. 480 U.S. at 707, 107 S.Ct. at 1491.
Here as well, as the Claims Court held, there is no explicit waiver of the navigational servitude by treaty or statute. Thus, because of the servitude, the Tribes are not entitled to compensation for the claimed riverbed lands which were not, therefore, “taken”, nor for water power values of riparian lands as part of compensation for the taking of those lands. To this extent, the majority has affirmed the Claims Court.

Fair and Honorable Dealings Claim

Turning to the fair and honorable dealings claim, although I agree that a remand is appropriate, I reach that conclusion under a different analysis from that of the majority.
Under section 2(5) of the ICCA, Congress created a retroactive statutory claim for damages for a failure by the United States to live up to a standard of “fair and honorable dealings” with an Indian tribe that is “not recognized by any existing rule of law or equity.” I find it confusing and unhelpful to describe or think of this claim as “extra-legal,” see Confederated Tribes v. United States, 20 Cl.Ct. 31, 33 (1990), or to say that the Claims Court “erroneously attempted to make a legal construct (a navigational servitude defense) determinative of issues which are not necessarily limited to legal and equitable bases.” Majority’s op. at 1112. After enactment of this cause of action, such claim is as “legal” as any other statutory claim which never previously existed at law or equity. Given broad direction from Congress, it is incumbent on the courts to define what are the metes and bounds of a “fair and honorable dealings” claim.[1] Thus, the courts *1120 may recognize that the sovereign’s navigational servitude negates, in appropriate circumstances, a fair and honorable dealings claim. Indeed, merely by recasting a “takings” claim as a breach of “fair and honorable dealings,” in my view, the Tribe cannot escape that sovereign power. The ICAA language does not meet the requirement that a Constitutional power can be overcome only by express waiver. See Cherokee, 480 U.S. at 707, 107 S.Ct. at 1491. That appears to be what the Claims Court held and I agree. However, I do not believe that ends this case.
In Aleut Community v. United States, 480 F.2d 831, 202 Ct.Cl. 182 (1973), the Court of Claims set out a four part test for establishing a fair and honorable dealings claim:
There must be a showing [1] that the United States undertook an obligation, a “special relationship”, [2] the obligation was to the Tribe, [3] that the United States failed to meet its obligation, and [4] that as a result the Tribe suffered damages.
Id., 480 F.2d at 839. Aleut dealt with the fishing and hunting dependency of the Tribes and found a breach of fair and honorable dealings by the United States restricting the Aleuts to a single island which was unable to support the native population and which forced them into dire poverty. Each of the factors of the test was held to be satisfied.
In United States v. Oneida Nation of New York, 576 F.2d 870, 217 Ct.Cl. 45 (1978), the United States was found to have a “special responsibility” to the Oneidas to protect them, as far as it could, in the possession of their lands in the State of New York because of the Tribes’ assistance during the Revolutionary War. Since the Continental Congress did nothing to impede or discourage the sale of Oneida lands to the State of New York at an “unfair price,” the Court of Claims upheld the Oneida’s claim for damages against the United States under the fair and honorable dealings clause. The Court explained that the Continental Congress “did not do the minimum required of it; instead it wholly shirked its obligation,” stating:
Where there is a special responsibility, it is not “fair and honorable” to do less in help than one can and should reasonably do — regardless of whether that aid would in the end have proved decisive.
Oneida, 576 F.2d at 882. Oneida does not mention the Aleut “test” set out a few years before and the facts, as stated, do not appear to satisfy the four-element test inasmuch as the Continental Congress could not control either party to the land sale. The Oneida majority essentially made a moral judgment that the United States did not live up to its “fiduciary” responsibilities toward the Tribe.[2]
Here, the Tribes assert that a special relationship concerning hydropower was created between the United States and the Tribes by the 1891 agreement with the Tribes, statutes recognizing hydrosites as assets of reservations, actual withdrawal of the Colville power sites, granting and cancelling a power license, and commitments made to the Tribes and to the Bureau of Indian Affairs upon that cancellation.
I do not believe the Aleut standard fits this case well. Like the majority in Oneida, I do not accept Aleut as setting out the definitive word on the metes and bounds of a statutory “fair and honorable dealings” claim. It is only one possible standard. The statutory language itself suggests the viability of a claim based on a course of dealings between the government and a Tribe (rather than on a “special relationship”). I believe this is more than merely a semantic difference. A course of dealings requires an evaluation of conduct, i.e., “dealings” between the United States and the Tribes and then a judgmental evaluation of whether that conduct was unfair or dishonorable on the part of the United States and resulted in damage to the *1121 Tribes. While the statutes relied upon by the Tribes do not waive sovereign power, they are, nevertheless, pertinent to the fair and honorable dealings claim in that the statutes recognized the value of water power as an asset of the Tribes and provided for federal licensing of nonfederal development. Before the federal Grand Coulee project, it is undisputed that the Tribes were attempting commercial development of the Columbia River from riparian lands upstream from Grand Coulee.
Given these circumstances, the Colville Tribes may have a claim based on a “course of dealings” respecting the Tribes’ development of water power which would not be tied to considerations respecting valuation or taking of its land which in this ease is subject to navigational servitude. As a claim for unfair dealings respecting the Tribes’ own development of water power (apart from the taking of land), navigational servitude becomes only a factor to be considered rather than a bar. See Cherokee Nation at Okla. v. United States, 937 F.2d 1539, 1546 (10th Cir.), modified and reh’g denied, 948 F.2d 635, 637 (1991), petition for cert. filed (Feb. 24, 1992) (No. 91-1354) (navigational servitude, though not a bar to a fair and honorable dealings claim, “should be considered as an important factor”).
In my view, the Tribes in this case may have a claim comparable to that asserted in Gila River Pima-Maricopa Indian Community v. United States, 684 F.2d 852, 231 Ct.Cl. 193 (1982).[3] There, the Indian Community asserted a “fair and honorable dealings” claim for compensation for the loss of irrigation water which they could have captured each year since 1868 and beneficially utilized on their tribal lands but which was, instead, diverted by upstream non-Tribe users. The asserted claim sought compensation for the lack of sufficient water each year to irrigate all practicably irrigable lands of their reservation, approximately 167,846 acres. The Indians stated that the issue was, “Did the Federal Government do whatever it was required to do, in the circumstances[?]”. Gila River, 684 F.2d at 861; see also Oneida Tribe of Indians of Wisconsin v. United States, 165 Ct.Cl. 487, 494, cert. denied, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964). The court concluded that “the United States could not honorably or fairly avert its face from the continuous loss of water suffered by the Pimas and Maricopas. Reasonable action was required to end the loss or to provide an equivalent supply.” Gila River, 684 F.2d at 862. Inasmuch as the government delayed taking action for a period of years, the government was held liable for the breach of fair and honorable dealings, but the claim was limited to the same 7,000 to 8,000 acres which was the maximum the Indians were able, when the full flow of the river was available to them, to put into cultivation.
Like the Pima-Maricopa Indians who were irrigating their lands, the Tribes of the Colville Reservation were endeavoring to exploit the natural assets of their Reservation by developing water power sites along the Columbia River. In the Pima-Maricopa’s case, the United States’ unfair and dishonorable dealings amounted to its knowing failure to prevent others from interfering with the endeavors of the Pima-Maricopa Indians. Here, the United States itself knowingly interfered with and frustrated the endeavors of the Colville Tribes. Thus, I agree with the majority that this case must be remanded. I would not, however, leave the remand open ended. The only possible basis for the fair and honorable dealings claim relates to the dealings of the United States which may have precluded the Tribes from obtaining economic benefits on its own from the available water power to riparian Tribal lands, but for the building of the Grand Coulee Dam.

. See, for example, the body of case law which this court has developed respecting the meaning of 19 U.S.C. § 1337, which prohibits “unfair *1120 methods of competition in the importation of goods into the United States."

. See the erudite dissent of Judge Nichols, questioning the ability of judges to make this moral judgment on statesmen of the past. 576 F.2d at 882-887.

. At least there is enough record evidence to preclude summary judgment.