UNITED STATES

v.

**The ONEIDA NATION OF NEW YORK et al.**

No. 5–76.

United States Court of Claims.

May 17, 1978.

A. Donald Mileur, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for appellant; M. Edward Bander, Washington, D. C., of counsel.

Marvin S. Chapman, Chicago, Ill., for appellees; Dean A. Dickie and Aaron, Aaron, Schimberg & Hess, Chicago, Ill., of counsel.

Before DAVIS, NICHOLS and KUNZIG, Judges.

## ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

DAVIS, Judge.

This is an unusual case, harking back to the preconstitutional period of our country's history, under the "fair and honorable dealings" clause of the Indian Claims Commis-

sion Act, 25 U.S.C. § 70a(5) (1970).[1] Claims one and two of a suit filed in the Indian Claims Commission by the appellee, Oneida Nation of New York, alleged that that Indian entity did not receive a fair price for lands it "sold," through unfair pressure and deceit, to the State of New York in 1785 and 1788, and that the Federal Government is responsible under the "fair and honorable dealings" clause for any shortfall in consideration because it did not live up to its fiduciary relationship to help and protect the Oneidas in their land relationships with others, including New York. The first claim concerns a land "cession" from the Oneida Nation to New York of some 293,-600 acres under the Treaty of Fort Herkimer of June 28, 1785 (between New York and the Oneidas), while the second involves the "cession" of the balance of the lands belonging to the Oneidas in New York (with the exception of some 239,618.55 acres reserved for their use) under the Treaty of Fort Schuyler of September 22, 1788 (also between the State and the Indians).

In the decisions now before us, the Indian Claims Commission, with one dissent, determined, after trial, that (1) the Oneidas were unfairly treated by New York in these two treaties; (2) the United States then had a fiduciary relationship toward the Oneidas with relation to their lands; (3) the Federal Government (i. e. the Congress) knew, or should have known, about the 1785 and 1788 transactions, before and after they were consummated; (4) with respect to these 1785 and 1788 transactions, the United States did not satisfy its obligations re-sulting from its fiduciary relationship toward the Oneidas; and (5) because of this breach, the Federal Government is liable under the "fair and honorable dealings" clause for the amounts the Oneidas should have received from New York in 1785 and 1788, if they had been given fair compensation. 20 Ind.Cl.Comm. 337 (1969); 26 Ind.Cl.Comm. 583 (1971); 37 Ind.Cl.Comm. 522 (1976).[2] The Government has appealed. It does not contest the determination or findings on New York's treatment of the Oneidas, or the finding that the federal Congress was or should have been aware of the transactions, but it objects to each of the other three rulings.

## I.

We deal at the outset with a very belated request, from the Indian side, that we postpone decision in this case indefinitely because of some possible effect of our determination on litigation which may conceivably be brought to declare the Oneidas still the owners of the lands involved here. On January 19, 1978, less than two weeks before oral argument, appellees, through their counsel of record, moved to postpone argument and hold in abeyance consideration and determination of the appeal. This was denied by order of January 26, 1978, without prejudice to appellees' urging upon the panel designated to hear the appeal that the court refrain from ruling on the extinguishment of the Oneidas' title to these lands. Four days before argument, a "pro se motion to postpone argument" was

1. Clause 5 of Section 2 of the Indian Claims Commission Act provides that the Commission has jurisdiction to hear and determine (among other categories) "claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity."

2. The Oneida's suit covered, in eight claims, lands ceded to New York in 27 treaties negotiated during the period from 1785 through 1846. This appeal concerns only the first two of those transfers. Earlier, the Commission ruled the Government liable (on claims three through seven) if the Indians did not receive proper consideration for the lands sold to the State between 1795 and 1846. 26 Ind.Cl.Comm. 138 (1971). On appeal, this court found a fiduciary duty under the Trade and Intercourse Act of 1790, ch. XXXIII, § 4, 1 Stat. 137, 138 (now in modified form 25 U.S.C. § 177 (1970)). *United States v. Oneida Nation of New York*, 477 F.2d 939, 942–43, 201 Ct.Cl. 546, 550–52 (1973). The court remanded for determination of whether the United States knew or had reason to know of the 23 treaties at which it apparently did not have representatives, while liability was affirmed for the two treaties at which the United States, did have representatives. A trial was held by the Commission on the issue of scienter, and a decision is now pending. An eighth claim was dismissed by the Commission (with prejudice) at the plaintiffs' request. 33 Ind.Cl.Comm. 69 (1974).

lodged by two representatives (not members of our bar) of the Oneida Tribe of Indians of Wisconsin, one of several appellees;[3] this document asserted that Marvin S. Chapman, record attorney for all appellees, had very recently (after our order of January 26, 1978) been "suspended" by the Wisconsin Oneidas as its attorney in this matter, and asked for postponement in order, *inter alia*, to assess the impact of this case on other actions seeking the return of Oneida lands. Oral argument was nevertheless had at the appointed time but the representatives who had filed the "pro se motion" were allowed to address the court briefly and were given permission to file, post-argument, a memorandum supporting their request for postponement of decision. Such a document was then filed. (Both the appellant and Mr. Chapman have responded to this memorandum.)[4] The core of the Wisconsin Oneidas' desire for delay is that they fear that any decision we render may have an adverse impact on suits which they would like to see brought against New York to compel return of (or award of the current value for) the Oneida lands transferred to the States from 1785 to 1846 (*see* footnote 2, *supra*) on the ground that those "sales" were all illegal, or were not transfers of title, and the Indians still retain their aboriginal title.

■ We refuse to postpone decision. This suit has been pending for almost 27 years, ever since it was filed with the Commission in August 1951. There have been three separate decisions by the Commission (in 1969, 1971, and 1976) on the two pre-1790 claims involved in this appeal, and two separate trials. The last decision of the Commission (which we are asked to review) was rendered over two years ago, on March 19, 1976. The case was fully briefed and set for argument on a day certain (early in February 1978) before there was any intimation to the court, a short while prior to

argument, that a postponement was desired because of other possible litigation founded on the claim that the Oneidas still own the New York land. But this is a matter which has been in the wind for a very substantial period. It is quite clear that certain portions of the Oneida Nation have for some years considered suit against New York or its subordinate units for return or current value of Oneida lands in that area. *See, e. g., Oneida Indian Nation of New York v. County of Oneida, New York,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). We are informed that in 1966 and 1967 Oneidas, including the Wisconsin Oneidas, retained a New York law firm for the prosecution of Oneida claims against New York with respect to the former Oneida lands in that state. All appellees, including the Wisconsin Oneidas, were thus on notice of the possibility of this type of litigation against the State. At the same time, appellees, again including the Wisconsin Oneidas, were also on notice of the present litigation under the Indian Claims Commission Act; Mr. Chapman, the attorney of record and their contract attorney for about a quarter of a century, informs us that he has provided them with copies of the pleadings and briefs and memoranda filed with the Commission and this court. There is no doubt that the Wisconsin Oneidas and the other appellees had full opportunity, long before this eleventh hour, to drop the present claims or to ask the Commission to suspend the proceedings. Moreover, the anticipated action against New York had not been brought at the time this opinion was adopted and it is improbable that, if brought, it would cover these pre-1790 claims which unlike the others are not governed by the Trade and Intercourse Act of 1790 (*see* footnote 2, supra).

We must conclude, as we did with the similar problem in *Western Shoshone Legal Defense and Education Assn. v. United*

---

**3.** The appellees consist of the Oneida Nation of New York, the Oneida Tribe of Indians of Wisconsin, the Oneida Nation by Julius Danforth, Oscar Archiquette, Sherman Skenandore, Mamie Smith, Milton Babcock, Beryl Smith and Amanda Pierce.

**4.** The Government opposes postponement. Mr. Chapman takes no position on that point but discusses several of the Wisconsin Oneida's allegations concerning his role in this litigation.

*States*, 531 F.2d 495, 209 Ct.Cl. 43, *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976), that it is not unfair to the Wisconsin Oneidas to reject their belated request for postponement, and that on the contrary it would be unfair to the Government, to the due administration of the Indian Claims Commission Act, to the Commission, to this court, and perhaps to other appellees, to delay decision to an indefinite date which may turn out to be the Greek kalends. *See, also, Sioux Tribe v. United States*, 64 F.Supp. 312, 336, 105 Ct.Cl. 725, 811, *vacated and remanded*, 329 U.S. 685, 67 S.Ct. 364, 91 L.Ed. 602 (1946) (for consideration of possible claims under Indian Claims Commission Act), *prior judgment affirmed and re-entered*, 78 F.Supp. 793, 112 Ct.Cl. 50 (1948), *cert. denied*, 337 U.S. 908, 69 S.Ct. 1046, 93 L.Ed. 1720 (1949). The request is far too late and too nebulous for us to accede to it.[5]

## II.

It is not contested on this appeal that New York treated the Oneidas unfairly in inducing them to sell land-interests to the state in 1785 and 1788, and that the Indians did not voluntarily sell their lands at that time. The facts found by the Commission are these: In the 1785 treaty negotiations with New York at Fort Herkimer, the Oneidas initially were unwilling to sell any land. To satisfy Governor Clinton, who was trying to purchase land for New York, the Indians offered to sell a tract between the Delaware and Susquehanna rivers. Governor Clinton told the Indians that a much larger tract in the southern part of the Oneida territory was desired. On June 25, 1785, Petrus the Minister, the Oneidas' main spokesman, informed the Governor that they could not sell the tract because it

was important hunting land. The following day Governor Clinton accused the Oneidas of acting in bad faith and told them that the century-long friendship with New York State would end if they did not deal honestly. He also told them that, if they did not sell the land, he would not protect them from the incursions of white settlers. That night, New York commissioners held private conferences with various Oneidas, and on June 27, 1785, Petrus the Minister announced that he would no longer participate in the council, since Governor Clinton did not trust him. Peter the Quarter Master, the Oneidas' new spokesman, then announced that they would sell part of the land desired by the Governor. The latter told Peter the Quarter Master that he would not pay the full price for only a part of the land. The Indian representative answered that the land was not being sold for money, but only because it was necessary to preserve the friendship between New York and the Oneidas.

Subsequently, in 1787 and 1788 a number of private land speculators entered into 999-year leases with the Oneidas, which were later declared by the New York legislature to be sales and therefore void under the New York Constitution (which forbade Indian land-sales without consent of the legislature). The Oneidas were informed by the New York Indian commissioners that the leases could cause the loss of all their lands and jeopardize their friendship with New York. It was said to be important for them to attend the Fort Schuyler Treaty, as only the Governor and the Indian commissioners could rescue them from their predicament. Governor Clinton commenced the negotiations on September 20, 1788, by telling the Oneidas that New York did not intend to

---

5. The other points raised by the Wisconsin Oneidas are without merit. Mr. Chapman was not properly removed from the case by the hasty, last-minute, unilateral action of the Wisconsin Oneidas without leave of court or consent of Mr. Chapman (*see* Rule 203(c)), especially since there are other appellees who have not challenged his representation of them. The Wisconsin Oneidas have long been on notice of Mr. Chapman's relationship to the other appellees residing in New York. Nor is there any adequate showing of a conflict of interest, bearing on the litigation now before us, on the part of Mr. Chapman. The Wisconsin Oneidas' assertions as to controversies between various groups of Oneidas do not affect the substance of this appeal, though they may relate to what is done with any award ultimately made.

purchase more land from them.[6] He then explained an agreement reached between the Onondagas and New York shortly before, under which the Onondagas ceded their land to New York, while reserving a tract of land for themselves which could not be entered by whites. He told the Oneidas that they would be forced off their lands, if they did not accept a similar arrangement, because the state would be powerless to help them.[7] Good Peter, the Oneidas' spokesman, stated that he understood the purpose of the treaty was not to purchase more land, but to remove the confusion concerning the Oneidas' land. The Oneidas made two proposals on the size of the tract they wished to reserve for themselves, but these suggestions were rejected as being too large. The Indians then asked the commissioners what the latter felt was a proper reservation for the Oneidas, and accepted the reservation that was proposed for them.[8]

The details of these negotiations may not have been known to the then Federal Government but the Commission has found—and it is uncontested in this court—

that the Government knew in 1785 and 1788 that New York intended shortly to obtain land from the Oneidas,[9] and also knew about the actual consummation of the Fort Herkimer and Fort Schuyler treaties.

## III.

The first point at issue is whether the Federal Government had undertaken, before these 1785 and 1788 cessions, a special or fiduciary obligation toward the Oneidas to protect them, as far as it could, in the peaceful possession of their New York lands. The Commission made an extensive historical examination of the relations and dealings between the United States and the Oneidas, including repeated assurances of special treatment and protection for the Oneidas by the United States because of the Oneidas' loyalty to the Americans during the Revolutionary War, and concluded that the United States had entered into a special relation with the Oneida Nation under Article II of the Treaty of Fort Stanwix of October 22, 1784, 7 Stat. 15.[10]

6. The act passed by the New York Legislature on March 1, 1788, authorizing the treaty, specifically provided that one of the purposes of the treaty was the purchase of Indian land. Eleventh Session, Chapter XLVII.

7. On March 1, 1788, pursuant to the resolutions of the state legislature, Governor Clinton had promulgated a proclamation ordering the lessees under the 999-year leases not to intrude upon, enter, or settle upon the land involved in the leases.

8. Before the execution of the deed of cession on September 22, 1788, Good Peter addressed Governor Clinton and the other commissioners:
 "We are this Day come together with our Pipes in Peace. We have been deliberating upon Matters of the greatest Importance respecting us all here present. We now return you our Thanks, Brother Chief, that you have brought to a happy Close the Business of this Treaty. My Nation are now restored to a Possession of their Property which they were in danger of having lost. Had not my Father the French Gentleman [Peter Penet] discovered it we should have been drowned; had it not come to your Ears, we with all our Property would have been buried very deep in Ruin; therefore we do heartily congratulate you this Day upon having accomplished the Treaty and thereby

secured to us so much of our Property which would otherwise have been lost."

9. The New York statute directing its commissioners to obtain land from the Indians was published on the front page of the New York Packet on April 18, 1785; New York City newspapers were regularly received by Congress on each publication date in sufficient quantities for each member. A Massachusetts delegate to the Congress also notified his state legislature so that it could protect its interests in western New York lands (these interests are discussed in *Seneca Nation of Indians v. United States*, 173 Ct.Cl. 917, 919–920 (1965)).

 The New York act appointing commissioners to obtain land in 1788 was also reported in the newspapers to which Congress still maintained its subscriptions. Two of the newly appointed commissioners were even delegates to Congress. Also, on July 7, 1788, Henry Knox, Secretary of War, presented to Congress a letter from Richard Butler, federal Superintendent of Indian Affairs, stating that the Six Nations had informed him that New York had called them to a treaty at Fort Schuyler.

10. Article II of the Treaty provided:
 "The Oneida and Tuscarora nations shall be secured in the possession of the lands on which they are settled."

The Oneidas, along with the Tuscaroras, were the only two tribes of the Six Nations [11] which remained at peace with the United States during the Revolutionary War. From the very beginning of that conflict, the colonies realized the importance of maintaining the neutrality of the Indians. In the latter part of 1775, the Indian commissioners of the Continental Congress assured the Six Nations that Congress would protect their lands against not only the British but also against any attempt of the separate colonies to preempt their lands. By mid-1776 it had become apparent that the other tribes of the Six Nations (Cayugas, Mohawks, Onondagas, Senecas) were engaging in active combat on the side of the British. In August 1776 the commissioners for the United States held a conference with the Six Nations at which they accused the hostile tribes of violating their pledges of neutrality of the previous year and asked them to declare their true intentions. The Oneidas and Tuscaroras reaffirmed their friendship and were told by the commissioners that the American Confederation would protect them from all their enemies. By 1777, the hostile tribes were engaging in open, active combat. On December 3, 1777, the Continental Congress sent a message to the Six Nations asking the hostile tribes why they were disloyal and telling the Oneidas they would be protected. In May 1778 Congress passed a resolution telling General Gates to provide the Oneidas with the protection promised on behalf of the United States by the commissioners.[12]

11. The Six Nations were the Oneidas, Tuscaroras, Cayugas, Mohawks, Onondagas and Senecas.

12. The Commission's findings give the specific details of the Oneidas' efforts on behalf of the Revolution and of the representations made to them by the United States during the struggle. 26 Ind.Cl.Comm. at 594–605.

13. *Journals of the Continental Congress, 1774–1789, Volume XXV, 1783, p. 687.* A rejected version read (after the words "the said commissioners are therefore instructed") as follows:

> to take particular care to distinguish the lands claimed as the inheritance of those

The Treaty of Fort Stanwix in 1784 was to end the hostilities between the United States and the four adverse units of the Six Nations, as well as to regularize relationships with all of the Six Nations. In 1783 the Continental Congress adopted a resolution authorizing the holding of the treaty at Fort Stanwix, providing with regard to the friendly Oneida and Tuscarora tribes: [13]

> Sixthly, and whereas the Oneida and Tuscarora tribes had adhered to the cause of America and joined her arms in the course of the late war, *and Congress have frequently assured them of peculiar marks of favour and friendship,* the said commissioners are therefore instructed to reassure the said tribes of the friendship of the United States *and that they may rely that the lands which they claim as their inheritance will be reserved for their sole use and benefit until they may think fit for their own advantage to dispose of the same* [emphasis added].

In addressing the Six Nations in January 1784, in behalf of the United States, General Philip Schuyler told the hostile tribes that Americans had no right to settle on vacant land without proper authorization and that they had no right to settle on Oneida land without the permission of that nation.

During the treaty discussions at Fort Stanwix the commissioners made the following comment in connection with Article II of the treaty:

> It does not become the United States to forget those nations who preserved their

> tribes, to have them ascertained and enter into stipulations that they shall be reserved for the sole use and benefit of those tribes until they shall think it for their own advantage to dispose of them.

The following paragraph was also deleted from the resolution finally adopted:

> Provided that if those tribes shall voluntarily agree to exchange their present claims for a district more remote from the settlements of our citizens, and such exchange shall not be deemed disadvantageous by the State claiming the jurisdiction it shall be lawful for the Commissioners to ratify such exchange for the better security of the said Indians.

faith to them, and adhered to their cause, those therefore must be secured in the full and free enjoyment of those possessions.[14]

 Against this background the Commission correctly held that Article II of the Treaty of Fort Stanwix, culminating the close alliance and friendly relations between allies during the Revolutionary War, should be read as incorporating the frequent pledges of protection made by the Continental Congress to the Oneidas and Tuscaroras with regard to their land. The literal and somewhat ambiguous words of Article II (footnote 10, *supra*) do not stand alone. Federal agreements with Indians draw their meaning from representations by Government agents to the Indians, as well as from the Indians' own understanding. *Gila River Pima-Maricopa Indian Community v. United States*, 467 F.2d 1351, 1355, 199 Ct.Cl. 586, 593 (1972). A special relationship can rest on obligations arising from statutes, treaties, governmental acts and representations. *Gila River Pima-Maricopa Indian Community v. United States*, 427 F.2d 1194, 1199, 190 Ct.Cl. 790, 799, *cert. denied*, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970); *Lipan Apache Tribe v. United States*, 180 Ct.Cl. 487, 502 (1967). Whether such a special relationship existed for the purposes of the Claims Commission Act is thus a function of the entire course of dealings between the parties. *Oneida Tribe of Indians of Wisconsin v. United States*, 165 Ct.Cl. 487, 493–94, *cert. denied*, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964); *Snake or Paiute Indians v. United States*, 125 Ct.Cl. 241, 255, 112 F.Supp. 543, 552 (1953). Here, that course of dealings impels us to agree with the Commission that the relationship between the United States and the Oneidas' New York land was indeed special, "and from it there stemmed a special responsibility." *Oneida Tribe of Indians of Wisconsin v. United States, supra,* 165 Ct.Cl. at 493.

Appellant's answer is to invoke Article III of the Fort Stanwix Treaty (relating to lands of the hostile Cayugas, Mohawks, Onondagas, and Senecas),[15] and our holdings in *Six Nations v. United States*, 173 Ct.Cl. 899 (1965), and *Seneca Nation of Indians v. United States*, 173 Ct.Cl. 917 (1965). There, we ruled that the Continental Congress had assumed no fiduciary role under the Treaty in connection with land sales between the Indians and the Commonwealth of Pennsylvania and private individuals or companies awarded a preemptive right to purchase land from the Indians by Massachusetts. Defendant argues that separate language was provided in Article II of the Treaty for the Oneidas and Tuscaroras only because some land cession was demanded of the hostile tribes in Article III, that those groups were to be "secured in the peaceful possession" of their remaining lands in the same manner as the Oneidas and the Tuscaroras, and that the United States no more undertook to protect the Oneida Nation from "bad bargains with others" than the formerly adversary tribes of the Six Nations.

This contention ignores the very ground on which we placed *Six Nations* and *Seneca Nation of Indians.* We stressed the enemy status of the four tribes covered by Article III (and their treatment as such by the Congress and the treaty commissioners) as precluding any inference of a fiduciary re-

---

14. At the close of the treaty proceedings, the United States commissioners spoke to the Oneidas and Tuscaroras, saying that their preservation of faith to Congress and attachment to the fortunes of America "has justly raised your glory among the nations. It is a glory that will last as long as any memory of these times shall remain. Congress has not forgot your fidelity and attachment. They would not have made peace with the hostile tribes, without securing your interests, but such a peace is now concluded with them as is perfectly agreeable to you * * *." Finding 37, 26 Ind.Cl.Comm. at 617.

15. Article III first draws a boundary line as "the western boundary of the lands of the Six Nations," and then adds: "so that the Six Nations shall and do yield to the United States, all claims to the country west of the said boundary, and then they shall be secured .in the peaceful possession of the lands they inhabit east and north of the same, reserving only six miles square round the fort of Oswego, to the United States, for the support of the same."

lationship. In contrast, we reserved the present issue of the status under Article II of friendly Oneida lands in New York.[16] As shown *supra* at the beginning of this Part III and in the *Six Nations* opinion, the Federal Government's attitude toward the Oneidas differed markedly, both before and at the Fort Stanwix parley, from the way it approached the four hostile units blanketed by Article III. That sharp distinction leads to the opposing readings of Articles III and II even though their wording may surficially appear as twins.[17]

### IV.

### A.

A more complex problem is whether the United States failed to fulfill its obligation toward the Oneidas, given the provisions of the Articles of Confederation concerning Indians. Appellant urges that under Article IX of the Articles a state's right to purchase the lands of the Indians located within its boundaries was "inviolate" and that New York could buy the areas in question without the consent of the United States. It follows, says the appellant, that the central Government could lawfully do nothing to help the Oneidas in their negotiations with the State.

Though the Commission spent some time in reaching its understanding of the exact scope of Article IX (37 Ind.Cl.Comm. at 536–48, 600–12),[18] we need not follow that path. We shall assume *arguendo* that defendant is correct that the State had the full right of preemption, *i. e.* that it had the sole right to buy the Oneidas' New York lands, and that the central Government could not unilaterally prevent it from doing so. On that basis this case departs from those governed by the Trade and Intercourse Act of 1790 (and its successors, now 25 U.S.C. § 177 (1970)), under which the Federal Government did have the power to withhold consent to purchases of Indian land. In *Seneca Nation of Indians v. United States*, 173 Ct.Cl. 917 (1965), we held the Government liable under the principle of "fair and honorable dealings" to account for an agreement (with private parties) it sanctioned under the Trade and Intercourse Act without assuring a conscionable and just exchange; the United States assumed under that Act a special responsibility to protect the Indians in the possession of their lands. In *United States v. Oneida Nation of New York, supra*, 477 F.2d 939, 201 Ct.Cl. 546 (1973), we applied this holding to post-1790 sales by the Indians to states (including New York), and to transactions which the Government did not in fact oversee but of which it had actual or constructive knowledge.

> "You next express your gladness that the Six Nations your uncles have *given* us a part of *their* country. But it is quite the contrary. We have given the hostile party [of] the Six Nations some of the country which we conquered from them, and we have secured their lands to those who were friendly. Our friends have experienced our good faith; our enemies have felt our bounty & forgiveness." Pickering Papers, Volume 59, pp. 115–131. Harvard College Library.

16. In *Six Nations, supra*, 173 Ct.Cl. at 906 n.6, it was noted that:
> "Article II of the treaty provided that the Oneida and Tuscarora Nations (which had helped the states during the Revolution) 'shall be secured in the possession of the lands on which they are settled.' If this separate provision is thought to have had greater meaning for these friendly tribes, it is enough to note that the lands on which they were settled did not include the Pennsylvania territory with which this case is concerned."

17. This difference in attitude was summed up by representatives of the central Government a few months after Fort Stanwix. In January 1785 the United States commissioners at a treaty council at Pittsburgh with the Ottawa, Chippewa, Delaware, and Wyandot Indians made this comment about the Treaty of Fort Stanwix, in response to some speeches by the chiefs that the Six Nations had seen fit to give some land to the United States:

18. Article IX of the Articles of Confederation read in pertinent part:
> "The United States, in Congress assembled, shall also have the sole and exclusive right and power of . . . regulating the trade and managing all affairs with the Indians, not members of any of the States; provided that the legislative right of any State, within its own limits, be not infringed or violated . . . ."

We assume, as we say, that in 1785 and 1788 the central Government had, and could have, no such direct authority to forestall a sale to New York.[19] But the issue is not whether the United States could march the whole road against all obstacles, but whether it did "whatever it was required to do, in the circumstances * * *. That is the standard." *Oneida Tribe of Wisconsin, supra*, 165 Ct.Cl. at 494; *Gila River Pima-Maricopa Indian Community, supra*, 427 F.2d at 1198–99, 190 Ct.Cl. at 798. Although the central Government may not have been able to forbid the transactions, the nature of the chicanery practiced upon the Oneidas suggests that feasible levels of assistance (such as those suggested by the Commission)—short of forcing New York to desist or act fairly—might well have averted the harm. In 1788, a federal representative could have explained to the Oneidas that the 999-year leases had been invalidated and that they had not in fact lost their lands because of them. In 1785, an agent of the confederation could have pointed out possible bribes of the Indian chiefs. On both occasions, the Government could have advised the Indians that they did not have to deal with New York at all, as it did in the 1784 Fort Stanwix negotiations (*see infra*), or that the prices offered were too low. The backs of the obviously unwilling Oneidas could have been stiffened. Conversely, pressure could have been exerted on New York to deal fairly with the Oneidas. New York had only a right to purchase lands; it did not have a right to practice coercion or deception on the Indians. The Government did none of these things; it did not exert its influence at all;

it made not the slightest effort to aid the Oneidas or safeguard their interests. Instead of fulfilling its fiduciary duty, the United States acted as a bystander—"stand[ing] on the other side of the road and avert[ing] its face * * *." *Oneida Tribe of Indians, supra*, 165 Ct.Cl. at 493.

### B.

We feel secure that, whatever its precise reach,[20] Article IX of the Articles of Confederation did not prevent the central Government (especially in its own eyes) from meeting its obligation in the advisory ways we have just sketched. This is shown most clearly by the actual course of events in the 1780's. The confederation Government by no means took a "hands-off" approach toward the states' dealings with Indian lands. Witness the vigor with which the United States defended its interests before and at the treaty negotiations of Fort Stanwix in 1783–84. At that time the union Government felt no obligation under Article IX to defer to the wishes of New York, when the latter was trying to purchase land. The Government was aware of New York's intentions before the treaty negotiations.[21] On March 17, 1783, the state legislature had instructed its commissioners to exchange land belonging to the Senecas in western New York for Oneida land in the central part of the state. The Governor of New York had called a meeting with the Six Nations at Fort Stanwix prior to the federal treaty council, and had tried to purchase land from the Indians. They informed him that they preferred to

19. The Commission agreed that the United States probably could not have used criminal sanctions, legal action, or military intervention in 1785 or 1788. 37 Ind.Cl.Comm. at 550. Similarly, we noted in an earlier opinion that Article IX "may have deprived the Congress of the power to *oversee* the Six Nations' dealings with Pennsylvania with respect to lands within its boundaries." *Six Nations, supra*, 173 Ct.Cl. at 905 [emphasis added].

20. The Commission held that under Article IX (footnote 18, *supra*) New York's sole right (granted by the proviso) with respect to the Oneidas was the right of preemption, and with

that exception the United States retained the sole and exclusive right and power of managing all affairs with the Oneidas because they were not "members" of New York, since they maintained a separate tribal existence. Appellant urges that this is incorrect and that the Oneidas, even though they had a separate tribal existence, were nevertheless "members" of New York within the meaning of Article IX.

21. This can be seen from a rejected version of the congressional resolution authorizing the treaty negotiations at Fort Stanwix. *See* note 13, *supra*.

deal first with the central Government. The Governor advised the federal commissioners not to enter into any stipulations with Indians residing in New York prejudicial to the State's interest; they informed him that New York should subordinate its business with the Indians to that of the general treaty, as Pennsylvania had done.[22] In the summer of 1784 the Oneidas and Tuscaroras were warned by the United States commissioners not to sell or exchange any of their lands. All of the Six Nations were also told that any treaty with an individual state not sanctioned by Congress would be invalid. During the course of the treaty negotiations between the Six Nations and the central Government there was a clash with the New York authorities. New York citizens had been selling rum to the Indians attending the treaty council. The federal troops confiscated the rum and removed the sellers from the treaty grounds. A local sheriff then served process on Lieutenant Mercer, a federal officer, on the complaint of the rum sellers. The federal commissioners not only instructed Lieutenant Mercer to ignore the process, but notified the justices of the county court that such process constituted a violation of the Articles of the Confederation—federal officers could not carry out their duties if they were subject to state process.

Another strong indication that the Congress believed that it had substantial jurisdiction under Article IX over Indians within New York is the Ordinance for the Regulation of Indian Affairs, adopted in August 1786. The ordinance divided the Indian Department into two districts; the Northern District covered all Indian Nations within United States territory "westward of Hudson River" (including, of course, the New York tribes). This legislation directed that a superintendent be appointed for each dis-

trict; it was his responsibility to carry out congressional directives regarding Indian affairs and he was to report to Congress through the Secretary for War.

That the Congress felt itself endowed with considerable authority under Article IX is also revealed by the report of the Committee on Southern Indian Affairs presented to Congress on August 3, 1787; the committee had been appointed at the request of the Secretary of War to investigate disputes arising from the encroachments by citizens of Georgia and North Carolina on the lands of the Creek and Cherokee Nations, which presented a substantial danger of war. The committee commented thus on Article IX: [23]

[T]here is another circumstance far more embarrassing, and that is the clause in the confederation relative to managing all affairs with the Indians, &c. is differently construed by Congress and the two States within whose limits the said tribes and disputed lands are. The construction contended for by those States, if right, appears to the committee, to leave the federal powers, in this case, a mere nullity; and to make it totally uncertain on what principle Congress is to interfere between them and the said tribes; The States not only contend for this construction, but have actually pursued measures in conformity to it. North Carolina has undertaken to assign land to the Cherokees, and Georgia has proceeded to treat with the Creeks concerning peace, lands, and the objects, usually the principal ones in almost every treaty with the Indians. This construction appears to the committee not only to be productive of confusion, disputes and embarrassments in managing affairs with the Independent tribes within the limits of the States, but

---

**22.** Congress had instructed its commissioners at Fort Stanwix to assist the Pennsylvania commissioners in their attempt to purchase Indian land within Pennsylvania "as far as the same may consist with the general interest of the Union . . . ." *Six Nations, supra,* 173 Ct..Cl. at 903. Prior to the Treaty, Pennsylvania notified Congress of its intention to purchase land from the Six Nations; Congress directed

that Pennsylvania be notified of the time and place of the federal peace negotiations so that Pennsylvania's representatives "may attend for the *sole* purpose of making such purchase" (emphasis added). *Six Nations, supra,* 173 Ct.Cl. at 903.

**23.** XXXIII Journals of the Continental Congress 457 -59.

by no means the true one. The clause referred to is, "Congress shall have the sole and exclusive right and power of regulating the trade and managing all affairs with the Indians, not members of any of the States; provided that the Legislative right of any State within its own limits be not infringed or violated". In forming this clause, the parties to the federal compact, must have had some definite objects in view; the objects that come into view principally, in forming treaties or managing Affairs with the Indians, had been long understood and pretty well ascertained in this country. The committee conceive that it has been long the opinion of the country, supported by Justice and humanity, that the Indians have just claims to all lands occupied by and not fairly purchased from them; and that in managing affairs with them, the principal objects have been those of making war and peace, purchasing certain tracts of their lands, fixing the boundaries between them and our people, and preventing the latter settling on lands left in possession of the former. The powers necessary to these objects appear to the committee to be indivisible, and that the parties to the confederation must have intended to give them entire to the Union, or to have given them entire to the State; these powers before the revolution were possessed by the King, and exercised by him nor did they interfere with the legislative right of the colony within its limits; this distinction which was then and may be now taken, may perhaps serve to explain the proviso, part of the recited clause. The laws of the State can have no effect upon a tribe of Indians or their lands within the limits of the state so long as that tribe is independent, and not a member of the state, yet the laws of the state may be executed upon debtors, criminals, and other proper objects of those laws in all parts of it, and therefore *the union may make stipula-*

tions with any such tribe, secure it in the enjoyment of all or part of its lands, without infringing upon the legislative right in question. It cannot be supposed, the state has the powers mentioned without making the recited clause useless, and without absurdity in theory as well as in practice; for the Indian tribes are justly considered the common friends or enemies of the United States, and no particular state can have an exclusive interest in the management of Affairs with any of the tribes, except in some uncommon cases [emphasis added].

## V.

The last of defendant's arguments is that, in any event, the United States cannot be liable as fiduciary (or under the special relationship) because, though it might well have averted an unfair sale by advice or influence, it had no *legal power to prevent* the sale to New York (as it did have under the Trade and Intercourse Act of 1790). Perhaps that point might be sound if the Indians' claim were a purely legal one. But the "fair and honorable dealings" provision gives redress for "extralegal or moral claims of Indians against the United States." *Otoe and Missouria Tribe of Indians v. United States,* 131 F.Supp. 265, 283, 131 Ct.Cl. 593, 621, *cert. denied,* 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955). That clause can apply "even though no conventional claim in law or equity" is presented. *Oneida Tribe of Indians, supra,* 165 Ct.Cl. at 492. Under this part of the Indian Claims Commission Act, the question is simply whether it was less-than-fair-and-honorable to the Oneidas for the central Government to do nothing in 1785 and 1788 when New York's intentions were known and suspected. The Commission was correct, in our view, in holding that the United States could not, fairly and honorably, turn its back on the Indians, or stand aside and do nothing.[24] It may be

24. We have no solid evidence why the central Government took the role of pure bystander in 1785 and 1788, especially since it had taken a strong position with respect to New York at the time of the Fort Stanwix negotiations in 1783–84 (*see* Part IV, B, *supra* ). It may be that the union, having obtained at Fort Stanwix its primary desire to make peace with and

that the efforts the central Government could and should have put forth would have availed nothing and ended in utter failure. But that was by no means sure, and we cannot even say that failure was likely. Advice, caution, and support for the Indians, combined with exertion of influence on New York, may very well have won the day. In *Oneida Tribe of Indians, supra,* 165 Ct.Cl. at 494–500, we absolved the defendant, not because we were unable to say with certainty that federal action would have in fact saved the timber involved there, but only because "we cannot say that the defendant did less than it was required to do in the situation facing it \* \* \*. What the Government did was ineffective, but in view of all the circumstances it was not compelled to go further." In this case, on the other hand, the appellant did not do the minimum required of it; instead, it wholly shirked its obligation. It is just and appropriate that it be held responsible, under the "fair and honorable dealings" clause, for any failure of the Oneidas to receive fair compensation—even though, here too, no one can say with certainty that federal intervention would necessarily have prevented unfairness. Where there is a special responsibility, it is not "fair and honorable" to do less in help than one can and should reasonably do—regardless of whether that aid would in the end have proved decisive. The Indian Claims Commission Act authorizes a monetary recovery for less-than-fair-and-honorable-dealings of this kind, and a suitable measure in this instance is the difference (if any) between a fair price and what the Indians received from New York.[25] That can be presumed to be adequate pecuniary redress, under the Claims Commission Act, for the appellant's breach of obligation. *Cf. Seneca Nation of Indians v. United States,* 173 Ct.Cl. 912, 916–17 (1965); 173 Ct.Cl. 917, 925, 926, 927 (1965).[26]

*Affirmed.*

NICHOLS, Judge, concurring and dissenting:

I concur in Parts I and II of the opinion, and in much that is ably said elsewhere. Respectfully, I dissent from the main holding, that the Continental Congress acted dishonorably in not attempting to dissuade the Oneida Indians from yielding to the importunities of New York, or to exert moral suasion on the state itself. I find this proposition to translate anachronistically to the 18th century notions of honor and dishonor respecting Indians that originated in the 19th or 20th. I find significant the entire absence of any contemporary expression that the Congress acted dishonorably in this affair, nor do I believe that an informed person of honor would have so stated if he had adverted to the matter. The Oneidas complained of being hoodwinked by New York, but they did not accuse the Congress of being an accomplice. The idea that Congress should assume towards Indians the role of case worker to welfare client, teacher to pupil, or guardian to ward, had not yet been born. General expressions about or to the Oneidas, as wartime allies, would not have implied a relationship of that kind, nor would it have been seen as implied in the Treaty of Fort Stanwix. Congress, I believe, intended to respect the independence of the Oneidas, their territorial integrity, and their ability to manage their own affairs.

I wish to express my gratitude for the portion of Part V that acknowledges that

secure a cession from the four hostile parties of the Six Nations, then abandoned the Oneidas as no longer of much concern to dominant federal interests.

25. The Commission found only that the United States had failed to fulfill its special obligation to the Oneida Nation; it left the question of whether the Oneida Nation received conscionable consideration for the lands to further proceedings. 37 Ind.Cl.Comm. at 617.

26. Because of fears expressed by some of the appellees (*see* Part I, *supra* ), we make explicit that our decision does not determine whether the cessions to New York in 1785 and 1788 extinguished the Oneidas' Indian title to those lands. That issue is not before us, we have not passed upon it, and we do not imply or suggest any position on it.

what we are called on to do is to pass a moral judgment. That is the starting point of my analysis. Phrases such as "fiduciary role" and "special relationship" may make lawyers among us more comfortable, though they have no solid backing in legal or equitable rights and duties. Also, use of such language alluding to a moral judgment as if it were a technical rule of law, may raise fewer hackles among those, if any there be, who honor the memory of the Continental Congress.

The concept of a "special relationship" was I take it first floated in *Oneida Tribe of Indians of Wisconsin v. United States*, 165 Ct.Cl. 487, *cert. denied*, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964), in which we insisted that a "special relationship" existed, only to hold that the United States in that case (having no relation or resemblance to this) did all the relationship, special or other, required of it. All it means is that though there is no contract or treaty obligation, or formal trusteeship, honor may oblige the United States to take steps to protect Indians, who have slipped into a dependence on the honor of the United States, by one means or another. What honor requires depends on circumstances and will vary from case to case according to the conscience of the court. In that case, the United States had attempted some protection, though ineffectual, and it was held honor was satisfied.

Around the turn of the century there was a strong reaction against passing moral judgments on treaties, or legislative enactments, actual or proposed. *United States v. Choctaw Nation*, 179 U.S. 494, 21 S.Ct. 149, 45 L.Ed. 291 (1900), *reversing* 34 Ct.Cl. 17 (1899) (note dissents below); *Western Cherokee Indians v. United States*, 27 Ct.Cl. 1 (1891), *aff'd sub nom. United States v. Old Settlers*, 148 U.S. 427, 13 S.Ct. 650, 37 L.Ed. 509 (1893); *Montgomery v. United States*, 49 Ct.Cl. 574 (1914). I am inclined to believe that at that time any jurisdictional legislation that called for such moral judgments, without ambiguity, would have elicited a flat declaration that such a role was rejected as unsuited for an Article III court. It might have been reluctantly accepted for purely advisory adjudications such as we refused to entertain even when they involved legal rights after *Glidden Co. v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). Now we pass moral judgments every morning before breakfast, and never wonder, as past courts would have, whether we are good at it.

Though the role is relatively new for courts, historians have long been assessing the morality of statesmen, warriors, and prelates of the past. They have learned how to do it in a more sophisticated way than is often found in court opinions. For example, let me quote from Macaulay's essay on Machiavelli—

> Every age and every nation has certain characteristic vices, which prevail almost universally, which scarcely any person scruples to avow, and which even rigid moralists but faintly censure. Succeeding generations change the fashion of their morals, with the fashion of their hats and their coaches; take some other kind of wickedness under their patronage, and wonder at the depravity of their ancestors.

It pleases us to consider the Indian a protected ward as to his present needs, and a wronged victim as to the past. We wonder at the depravity of our ancestors because they had a different view. Our ancestors might have wondered at our depravity could they have enjoyed the gift of prophesy.

The whole essay is a superb example of Macaulay's technique in passing moral judgment on the past, and I cannot recommend it too highly. But it has not been universally accepted. Lord Acton, of the generation that followed Macaulay, may be taken as representing a contrary approach. He is best known to Americans today by the famous quote, become a cliché, about absolute power corrupting absolutely. This he tossed off as an aside in a personal letter to the Reverend Mandell Creighton, who had displeased Acton by being too easy on long dead Popes in his "History of the Papacy." Acton took the occasion to expound

his favorite thesis, which was that it is the duty of the historian to avenge the evil and wrong of the past, by harsh denunciation of its principal actors. In doing this, his standards are those of the present, because right and wrong do not change, like fashions in coaches and hats. Thus he would judge everyone from Attila the Hun to Zoroaster strictly by the standards of a Victorian English gentleman. *See Essays on Freedom and Power, Lord Acton,* selected by Gertrude Himmelfarb, Gloucester, Mass. 1972.

We have a good deal of Actonism with us today. Thus, we do not own slaves, or countenance others owning them, but Thomas Jefferson did, and therefore his memory is deemed by many not worthy of respect or veneration. Ironically, Acton himself defended slavery in an essay written in 1861, and therefore by his own technique of moral admeasurement, he was wicked too. Much of our contemporary Actonism is based on sheer ignorance, or the view that history is "not relevant," but Acton himself was enormously learned. Our national sport of discovering and denouncing the depravity of our ancestors has both knowledgeable and ignorant practitioners.

A certain amount of Actonism may well be deemed required, if not in all Indian Claims Commission adjudications, assuredly in those based on the "fair and honorable dealings" clause. I do not agree, however, that they must be kept free from any taint of Macaulayism. Anachronistic relation back of newly emerging ideas to as little as 24 years in the past, is rejected in *Gila River Pima-Maricopa Indian Community v. United States,* 427 F.2d 1194, 1200, 190 Ct.Cl. 790, 801, *cert. denied,* 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970) (Davis, J., concurring). The court opinion here, with all its ability and learning, I find to be pure Acton. I turn to what one influenced by Macaulay might deal with differently, and to whether he might reach a contrary conclusion.

One obvious difference is that Macaulay, but not Acton, would ask what was the reaction of informed contemporaries to the alleged iniquity. Macaulay makes a brilliant use of this technique in the Machiavelli essay, already cited, where he shows that there was no adverse criticism, on moral grounds, of Machiavelli's widely read book, *The Prince,* except on the part of readers of other countries, or other centuries. The parties to the instant case have carefully culled the debates of the Continental Congress, and I take it other relevant contemporary records and writings, without discovering any criticisms of the instant nonfeasance of the Continental Congress, and I conclude there were none. An Actonian would assign to this silence the explanation that everyone else was as morally obtuse as the Congress. It further appears that the Oneida Indians soon complained of being overreached by the State of New York, but made no complaint of being deserted by their supposed Big Brother, the Continental Congress. We have treated absence of complaint by Indians as significant; *e. g., Seneca Nation of Indians v. United States,* 173 Ct.Cl. 912, 916 (1965). The parties preparing this case presumably were on notice of that view.

Next one may turn to the alleged "special relation." During the war, the Continental Congress hoped to retain all the Six Nations as allies, a hope that was realized only as to the Oneidas and Tuscaroras. It appears to me that the promises made were of the kind that a nation in arms might normally make to an ally, or a nation hoped to be recruited as an ally. Their territorial integrity would be safeguarded. In 1777 (finding 15) they were told that as trusty friends "they would be protected and that their welfare should at all times be considered as the welfare of the Confederation [the United States]." But there was not, as might be expected there would not be from an ally, any undertaking to treat them as incompetents needing to be put under tutelage. I believe a reasonable 18th century person would have concluded that the Continental Congress meant to treat the Oneidas as an independent, sovereign nation. There was an express undertaking mentioned in the instructions to the commissioners who nego-

tiated the Treaty of Fort Stanwix, that the Oneidas could rely that their land would be "reserved for their sole use and benefit [territorial integrity] *until they may think it for their own advantage to dispose of the same.*" [Emphasis supplied.] (Finding 38.) This certainly implies not only that the right of the Oneidas, as an independent sovereign nation, to dispose of their land, was respected, but also that the Oneidas were considered capable of rational thought as to what terms for disposal were to their advantage. These instructions might well be read into the Treaty of Fort Stanwix and be considered a part thereof, but they are far removed from the Trade and Intercourse Act of July 22, 1790, 1 Stat. 137, by which the new Government established under the Constitution reduced Indians in the national territories to a state of tutelage in part at least, depriving them of some attributes of sovereignty, *i. e.,* the right to dispose of their lands as a sovereign normally might do if he saw fit.

Plaintiff quotes the House Report on the Indian Claims Commission Act, H.R.No. 1466, 79th Cong.2d Sess, at 1358, concerning the fair and honorable dealings clause, as follows:

> This extension of jurisdiction is believed to be justified by reason of the fact that we have always treated the Indian Tribes as non-sui juris and have set ourselves up as their guardians. In this relationship many claims, not strictly legal, but meritorious in character have developed * *.

If "we" means the United States Government under the present Constitution, the statement with the word "always" is true, for the Trade and Intercourse Act, *supra,* the first step in subjection to guardianship, was enacted almost immediately. If "we" includes the Continental Congress, it is wrong. The latter's object was to "manage" affairs with Indians, "making war and peace, purchasing certain tracts of their lands, fixing the boundaries between them and our people, and preventing the latter settling on lands left in possession of the former." Nothing was said about Indians being non-sui juris or under guardianship.

Report of Committee on Southern Indian Affairs, 1787, finding 84. Thus it appears to me to be highly questionable whether the legislative intent ever was that a "fair and honorable dealings" claim could properly arise out of the feasance or nonfeasance of the Continental Congress. The change of policy in the Trade and Intercourse Act was justified by circumstances, no doubt, but it was not the kind of subordination that would have been proposed to a touchy ally during a state of war. It was a case in 1790 of locking the barn after the horse was stolen, so far as concerned the Oneidas, but it does not establish that the previous policy was not in good faith.

There has been much discussion by the Commission and by counsel before us as to the meaning of Art. IX of the Articles of Confederation. Chairman Kuykendall holds that the "sole and exclusive power" in the Continental Congress of "regulating the trade and managing all affairs with the Indians, not members of any of the States" does not include organized tribes such as the Oneidas whose territories were within the boundaries of one of the original states. 37 Ind.Cl.Comm. 522 and ff. The court sees fit not to challenge this, and it seems to me the better view. Whether this is so or not, the proviso that "the legislative right of any state within its own limits be not infringed or violated," all agree means among other things that the state's preemption right, *i. e.,* its right to buy Indian land if Indians wished to sell, was supreme. *See* 37 Ind.Cl.Comm. at 546 and Madison letter, finding 83. Thus the state was guaranteed a right exactly corresponding to that of the Oneidas: if the Indians wished to sell, they could sell, and if the state wished to buy, it could buy. I agree with the court, however, that the interpretation of Article IX is not of great importance, but I say so for a different reason, I hope a truly Actonian reason. If Article IX committed the United States to inaction which but for Article IX was dishonorable in the circumstances, then it was dishonorable to enter into any such commitment. Moreover, if the inaction of the United States was due to its weakness,

then it was dishonorable of the United States to allow itself to be so weak, particularly vis-a-vis one of its own component states. I think the true answer is that the commitment or "special relationship" was entered into during a state of war and related primarily to contingencies that would arise in war. It did not address at all the contingency that unless the United States intervened, a peaceable buyer might overreach the Oneidas in a negotiation entered into peaceably, because they were incapable of evaluating their own best interests. This contingency could not have been stated expressly during the war without outraging the Oneidas, who would have viewed it as an attempt to reduce them to a dependent and subordinate position, which the Continental Congress at that point had no moral or legal right to assert. Therefore, it cannot be implied. The true commitment was an alliance possessing the attributes in relationship of the parties that alliance normally carries. The true issue is, without regard to Article IX, what if any reciprocal obligation did the benefit derived from the alliance carry over with it to a subsequent period of peace?

The court contrasts the strong stand the Continental Congress took to ward off the interference of New York in the 1784 peace negotiations with its inaction later. Refuting a similar contention in *Six Nations v. United States,* 173 Ct.Cl. 899, 907 (1965), we said "[T]his meant, however, no more (for lands within a state's boundaries) than that the making of peace should precede state-Indian business transactions and that the Union's problems should be settled before those of the states." It seems apparent to me that in 1784 New York was intruding into a jurisdiction clearly demarked for the Congress, the making of war and the negotiation of peace. *See* Madison letter, finding 83. On the later occasions it was, apart from chicanery, exercising a legal right.

The suspicion arises that both the commission majority and the court would have had the Continental Congress engage in a strong program of jawboning. (This word is absent from dictionaries of recent date, but our ancestors used the word "jaw" in a

related sense, *i. e.,* to scold.) The relationship of jawing or jawboning to honor is somewhat elusive. Some statesmen believe that honor requires them to do it when they lack the legal or military power to take effective action to secure an object they believe to be important. Others contend that honor requires them to keep silent under such circumstances. It is my impression that the 18th century mind would generally prefer the latter alternative; indeed the common recourse to jawing or jawboning is somewhat of a modern growth.

The Congress was supposed to intuit that Governor Clinton would defraud the Indians. Apart from jawboning, or as a means to effectuate it, the commission and the court majority would have had the Congress send a representative to the 1785 and 1788 negotiations between the Oneidas and New York. It would appear he should have been a lawyer and his presence with the tribe would have been required permanently in view of the tribe's penchant for selling or leasing land to private parties. This was what triggered New York to attempt to exercise its preemption rights in 1785 (finding 54), and again in 1788 (finding 65).

It appears to me that the idea of having a lawyer on the spot, useful as it might have been, was not one that would have occurred to the 18th century mind as an obligation of honor imposed by the circumstances. It is a product of the paternalism towards Indians of later centuries, related back to the 18th century by an Actonian type of moralistic anachronism. Similarly, no doubt, it would have been a fine thing to send a doctor to care for the health of the Oneidas, a school teacher so they could read and write, or a missionary. (The missionary it seems they had.) To mulct the United States for the losses supposedly caused by the lack of a lawyer would seem no more reasonable than to mulct it for Oneida deaths in an epidemic resulting from lack of a doctor. Even under 20th century notions, dishonor does not attach to not providing benefits of this kind, unless they are contracted for. *Gila River Pima-Maricopa Indian Community v. United States, supra.*

Before imputing dishonor to the Continental Congress for not providing these functionaries, it would seen a Macaulayite analysis would require consideration whether, to provide them would occur to an 18th century statesman as having been contracted for. If the Indians, invoking the alliance, had asked for a lawyer and the Congress had refused one, the case then might have been different. But it is not an 18th century, but a 20th century idea, to deem it mandatory for government to thrust on people benefits they have not asked for and possibly do not want.

Finally, I must add that the United States has honorably waived its sovereign immunity, waived the statute of limitations, and exposed itself to suits not even founded on law or equity. Thus it is to be mulcted for a wrong committed by another sovereign, to which it was not even an accomplice. New York, that perpetrated the wrong, has not waived sovereign immunity, nor the statute of limitations, nor can it be sued on moral grounds. There is a visible and obvious dishonor here, but it is not that of the United States.

I dissent.